IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 10-20041 |
| | § | |
| AMIDEE CAPITAL GROUP, INC., ET AL., | § | CHAPTER 11 |
| | § | |
| DEBTORS. | § | (Jointly Administered) |

**MOTION FOR AN ORDER: (I) APPROVING AUCTION AND BIDDING PROCEDURES AND AUCTION DATE; (II) SCHEDULING DATE AND TIME FOR SALE HEARING; (III) APPROVING FORM AND MANNER OF SERVICE OF NOTICE OF SALE HEARING AND AUCTION; (IV) APPROVING THE FORM AND MANNER OF SERVICE OF NOTICE OF ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE A HEARING ON THIS MOTION ON AUGUST 24, 2010 AT 10:00 A.M. IN COURTROOM 208, 1133 NORTH SHORELINE BLVD., CORPUS CHRISTI, TEXAS 78401.**

COMES NOW, Amidee Capital Group, Inc. ("ACG" or the "Debtor") on behalf of itself and its affiliates, all debtors and debtors in possession in the above referenced bankruptcy proceedings, and files this Motion for an Order: (i) Approving Auction and Bidding Procedures and Auction Date; (ii) Scheduling Date and Time for Sale Hearing; (iii) Approving Form and Manner of Service of Notice of the Sale Hearing and Auction; (iv) Approving Form and Manner

of Service of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (v) Granting Related Relief (the "Sale Procedure Motion"), pursuant to which the Debtors (defined below), in connection with a proposed sale and auction of substantially all of their assets, request the entry of an order: (i) approving auction and bidding procedures and an auction date; (ii) scheduling a date and time for sale hearing; (iii) approving the form and manner of service of notice of the sale hearing and auction; (iv) approving the form and manner of service of notice of the assumption and assignment of certain executory contracts and expired leases; and (v) granting related relief.  In support of the Sale Procedure Motion, the Debtors respectfully represent as follows:

## I. JURISDICTION

1. This Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (M).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

**A.   General Background of the Debtors**

2. On January 4, 2010 (the "Corpus Petition Date"), Amidee 2006 Preferred-Corpus, Ltd. ("Amidee Corpus"), a subsidiary of ACG, filed a voluntary petition for relief under chapter 11, title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Bankruptcy Court").  On January 17, 2010 (the "Petition Date"), ACG and nine of its other subsidiaries also filed voluntary petitions for relief under chapter 11 with the Bankruptcy Court.[1]  The Debtors' bankruptcy cases are collectively referred to as the "Reorganization Cases."

---

[1] The ACG subsidiaries who filed bankruptcy petitions on January 17, 2010, were: Amidee 2004-I Tax Deed and Certificate Investment Program, Ltd. ("Amidee 2004 Tax"); Amidee 2005-II Tax Deed Investment Program, Ltd. ("Amidee 2005

3. Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors remain in possession of their property and are managing their businesses as debtors in possession. No trustee or examiner has been appointed in the Reorganization Cases.

4. ACG is a Texas corporation formed in 2003 to acquire, renovate, operate and resell real property in Texas and throughout the United States. Initially, ACG focused its operations on the purchase of tax lien certificates on real property in Houston and the surrounding area. The "tax deed" properties acquired by ACG were purchased using funds raised pursuant to private placements of capital raised by ACG through the sale of limited partnership interests in the Subsidiary Debtors—Amidee 2004 Tax, Amidee 2005 Tax and Amidee 2006 Tax. Much of the real property ultimately acquired by ACG using the capital raised for these tax deed programs was either raw land or single family homes.

5. In 2006, ACG expanded its investment activities beyond raw land and single family homes and began actively looking to acquire and operate apartment complexes and office buildings. To fund these new acquisitions, in 2006, ACG raised additional capital through the sale of limited partnership interests in two additional limited partnerships—Amidee 2006 Preferred and Amidee 2006 Commercial. In 2007, 2008, and 2009, ACG formed an additional limited partnership each year and raised capital through the sale of the limited partnership interests in those entities—Amidee 2007, Amidee 2008 and Amidee 2009.

6. In the six years from 2004 to 2009, ACG raised approximately $24 million through the sale of limited partnership interests. Combined, approximately 350 different entities or individuals own limited partnership interests in one or more of the Subsidiary Debtors. While

---

Tax"); Amidee 2006-III Tax Deed and Real Estate Investment Program, Ltd. ("Amidee 2006 Tax"); Amidee 2006 Preferred Real Estate Income Program, Ltd. ("Amidee 2006 Preferred"); Amidee 2006 Commercial Real Estate Income Program, Ltd. ("Amidee 2006 Commercial"); Amidee 2007-I CRE Income Fund, Ltd. ("Amidee 2007"); Amidee 2008-I CRE Income Fund, Ltd. ("Amidee 2008"); Amidee 2009-I CRE Income Fund, Ltd. ("Amidee 2009"); and Amidee Oak Pointe Apartments, LLC ("Amidee Oak Pointe") (collectively with Amidee Corpus, the "Subsidiary Debtors" and with ACG, the "Debtors").

the number and identity of the limited partners vary for each of the Subsidiary Debtors, ACG is the sole general partner for each Subsidiary Debtor.[2]

7. In addition to the Subsidiary Debtors, ACG owns significant stakes in certain non-debtor entities. Specifically, ACG owns 100% of the outstanding shares of Amidee Hotels & Resorts, Inc., a Texas corporation, that owns and operates the Amidee Hotel Niagara in Niagara Falls, New York and the Parkway Plaza Hotel and Convention Center in Casper, Wyoming.[3] While these non-debtor entities are ultimately controlled by ACG and share some of the liquidity issues that triggered the bankruptcy filing of the Debtors, ACG determined that chapter 11 filings for these entities, at this time, would not be beneficial for those entities, their creditors or the properties that they own. ACG, however, intends to continue to manage these entities and their properties during the course of these Reorganization Cases.

8. In addition to the funds raised from the sale of limited partnership interests, ACG has in the past obtained funds for the acquisition, renovation and operation of the various properties it and its subsidiaries own through secured loans from various lending institutions and individuals. As of the Petition Date, ACG or one of the Subsidiary Debtors was the primary borrower on approximately $10.5 million in loans secured by various real property owned by the Debtors. In addition to these direct obligations of some of the Debtors, some of ACG's non-debtor subsidiaries are also borrowers on approximately an additional $11.5 million in secured

---

[2] Amidee Oak Pointe is actually an LLC, and ACG is therefore its sole managing member, rather than general partner. Amidee Oak Pointe and Amidee Corpus are special purpose entities formed to own a single piece of real property, and therefore third party investors do not own limited partnership interests (or non-managing membership interests) in these entities. Instead, all of Amidee Corpus' limited partnership interests are owned by Amidee 2008 and all of the non-managing membership interests in Amidee Oak Pointe are owned by Amidee 2007.

[3] Amidee Hotel Niagara is owned by Amidee Hotel Niagara, LLC and Parkway Plaza is owned by Amidee Wyoming, LLC both of which are 100% owned by Amidee Hotels & Resorts, Inc.

debt.[4] ACG estimates that the portfolio consisting of the real property owned directly by one of the Debtors is worth approximately $26.5 million

9.  All of the apartment complexes and office buildings owned by the Debtors are managed and operated directly by ACG personnel. ACG personnel are responsible for all aspects of the acquisition of properties as well as the marketing and eventual sale of those properties. Because ACG manages all aspects of the Subsidiary Debtors' operations, none of the Subsidiary Debtors has its own employees. Up until September 2009, ACG maintained a staff of approximately 30 employees and contract personnel to run the operations of ACG and all of its subsidiaries, including the Subsidiary Debtors. In an effort to reduce its overhead, in September 2009, ACG significantly reduced its staff by eliminating all personnel except those essential to keeping the properties operating. As of the Petition Date, ACG had 9 full time employees, and 6 contract workers.[5]

10. During the five years from 2004 to 2009, ACG successfully managed the real estate portfolio that it and its subsidiaries had acquired. In addition to servicing the secured debt incurred in the acquisition and renovation of numerous properties, ACG made in excess of $7 million in interest payments and distributions to the numerous investors in the various real estate entities it manages. By mid-2009, however, a number of factors, including the overall downturn in the United States' economy and the real estate market in particular, contributed to making ACG's cash flow extremely tight. ACG and its subsidiaries began having difficulty paying ongoing operating expenses and servicing their secured debt while still making fixed distributions to limited partners in the Subsidiary Debtors. In September 2009, ACG informed

---

[4] ACG is a guarantor of approximately $9.6 million of this amount which was borrowed by Amidee Hotels & Resorts.

[5] James T. Cook and Judith B. Cook, ACG's CEO and President, respectively, are not included in these employment numbers as they have voluntarily gone without salary since September 2009.

5

the limited partners in the Subsidiary Debtors that it was suspending regular partner distributions until it could get its cash flow difficulties under control.

11.     Unfortunately, the 4th quarter of 2009 did not bring improvement in the Debtors' cash flow situation.  Although ACG actively marketed most of the Debtors' real estate portfolio, it was unable to locate buyers for the properties at acceptable prices.  In December 2009, ACG retained Douglas J. Brickley of LECG, LLC to advise it with regard to possible restructuring options for ACG and its subsidiaries and help the Debtors to manage their worsening liquidity crisis.

12.     On January 4, 2010, ACG determined that filing a bankruptcy petition for Amidee Corpus was necessary in order to prevent foreclosure the next day on an office building in Corpus Christi, Texas owned by Amidee Corpus.   Although the bankruptcy of Amidee Corpus helped to avoid the immediate emergency that triggered the initial bankruptcy filing, ACG determined that no long-term solution to its liquidity crisis was likely without an opportunity to restructure the Debtors through a chapter 11 bankruptcy process.  Thus, on January 16, 2010, ACG's board of directors authorized chapter 11 filings for the Debtors and appointed Douglas Brickley as the Chief Restructuring Officer for ACG and the Subsidiary Debtors.  Pursuant to the board's resolution, Mr. Brickley has been given exclusive control of the Debtors' operations in bankruptcy and the restructuring effort.  ACG believes that the bankruptcy filings and the experienced leadership of Mr. Brickley will provide the Debtors with the best chance of reorganizing their operations and paying the greatest possible return to the Debtors' creditors and equity security holders.

**B.      Decision to Sell the Assets**

13.     After extensive evaluation of their business, consideration of all possible alternatives, and consultation with their various professionals, the Debtors have determined that an auction of substantially all of their Assets (defined below) is in the best interest of their estates and creditors, as such an auction will provide a fair and open process for sale which will afford the Assets the exposure to market forces necessary to maximize the value of the Assets.

14.     The Debtors shall file a *Motion for Order: (i) Authorizing the Sale of Substantially All of the Debtors' Assets, Free and Clear of Liens, Claims, Interests, and Encumbrances, Subject to Higher or Better Offers, Pursuant to Bankruptcy Code Sections 363 and 365; (ii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Such Sale and Determining and Adjudicating Cure Amounts With Respect to Such Contracts and Leases; (iii) Waiving the Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h); and (iv) Granting Related Relief* (the "Sale Motion"), pursuant to which the Debtors will seek the entry of an order (the "Sale Order"): (i) authorizing the sale of substantially all of the Assets, free and clear of liens, claims, interests and encumbrances, subject to higher or better offers; and (ii) approving the assumption and assignment of certain executory contracts and unexpired leases in connection with such sale and determining and adjudicating cure amounts with respect to such contracts and leases. The Debtors believe that the Sale Motion and the transactions contemplated within are in the best interests of the Debtors' estates and all other interested parties in these bankruptcy cases, as an orderly sale of the Assets is essential and very likely to result in greater value to the Debtors' estates than any piecemeal liquidation.

**C.    The Brokers**

15.    In connection with the marketing and sale of the Assets, the Debtors have retained two brokers, Situs, Inc. ("Situs") and Camelot Realty Group ("Camelot," and collectively with Situs, the "Brokers").

*i.    Situs*

16.    On April 26, 2010, the Debtors filed their *Application for an Order Pursuant to Sections 327(a) and 328 of the Bankruptcy Code Authorizing the Employment and Retention of Situs, Inc. as Real Estate Broker for the Debtors Nunc Pro Tunc to April 1, 2010* (the "Situs Retention Application"), pursuant to which the Debtors requested authority to retain Situs in connection with the marketing and sale of the Situs Assets (defined below). The terms of Situs' retention are governed by that certain Exclusive Commercial Real Estate Listing Agreement, dated April 23, 2010 (the "Situs Retention Agreement"). The Situs Retention Agreement provides, among other things, that: (i) Situs shall be retained as broker to the Debtors from April 1, 2010 to July 1, 2010 (the "Situs Term"); and (ii) Situs shall be entitled to a commission of 5% of the gross sales price of the Situs Assets in the event of a successful sale of the Situs Assets (the "Situs Commission"); provided, however, that if a sale of the Situs Assets occurs after the expiration of the Situs Term, but within 180 days of the end of the Situs Term, Situs will receive the Situs Commission if any of the Situs Assets are sold to a Qualified Bidder (defined below) procured through Situs' marketing efforts. On May 13, 2010, the Bankruptcy Court entered an order approving the Situs Retention Application pursuant to the terms of the Situs Retention Agreement.

    *ii.*  *Camelot*

  17.  On June 14, 2010, the Debtors filed their *Application for an Order Pursuant to Sections 327(a) and 328 of the Bankruptcy Code Authorizing the Employment and Retention of Camelot Realty Group as Real Estate Broker for the Debtors Nunc Pro Tunc to June 1, 2010* (the "Camelot Retention Application"), pursuant to which the Debtors requested authority to retain Camelot as real estate broker in connection with the marketing and sale of the Camelot Assets (defined below). The terms of Camelot's retention are governed by that certain Residential Real Estate Listing Agreement, dated June 14, 2010 (the "Camelot Retention Agreement"). The Camelot Retention Agreement provides, among other things, that: (i) Camelot shall be retained as broker to the Debtors from April 1, 2010 to March 31, 2011 (the "Camelot Term"); and (ii) Camelot shall be entitled to a commission of 3% of the gross sales price of the Camelot Assets (the "Camelot Commission") in the event of a successful sale of the Camelot Assets during the Camelot Term. On July 8, 2010, the Bankruptcy Court entered an order approving the Camelot Retention Application pursuant to the terms of the Camelot Retention Agreement.

**D.  The Sale Assets[6]**

    *i.*  *The Camelot Assets*

      1.  Commercial Acreage

  18.  On August 22, 2007, ACG obtained a Revolving Credit Note (the "Sterling Note") payable to Sterling Bank ("Sterling") with a credit limit of up to $1,635,000. The Sterling Note is secured by a Deed of Trust and Security Agreement (with Assignment of Rents and Leases and Financing Statement) ("Sterling Deed of Trust") (together with the Sterling Note, the "Sterling Loan Documents") dated same that grants James W. Goolsby (the "Trustee"), in

---

[6] A list of the individual properties which comprise the Assets (defined below) is attached to the proposed Bid Procedures which are attached to this Sale Procedure Motion as Exhibit A.

9

trust for the benefit of Sterling a security interest in certain commercial acreage owned by ACG, namely the properties in Houston, Texas known as: (i) Martin Luther King Blvd. 12100; (ii) West Orem; and (iii) Blanco & Ley Road (together, the "Commercial Acreage"). Sterling also retains a security interest in the personal property and fixtures located on the Commercial Acreage. Pursuant to the Sterling Loan Documents, it appears that Sterling has a lien on the Commercial Acreage including the cash generated by same. ACG does not know the exact amount currently due to Sterling under the Sterling Note, but believes that the principal balance of the Sterling Note as of the Petition Date was approximately $1,250,000.

2. Rent Houses

19. ACG also obtained a loan from Sterling to finance the purchase of certain rental houses located in Houston, Texas at Avenue G and 2425 Lucky Street (the "Rent Houses"). It appears that Sterling has a lien on the Rent Houses including any cash generated by same. ACG does not know the exact amount currently due to Sterling under the loan documents for the Rent Houses, but believes that the principal balance due as of the Petition Date was approximately $85,000.

3. Unencumbered Assets

20. In addition to the Commercial Acreage and the Rent Houses, the Debtors own a series of both developed and undeveloped parcels of land in and around the Houston, Texas area (the "Unencumbered Assets,", and collectively with the Commercial Acreage and the Rent Houses, but not including the 35 acre tract on Ley Road the "Camelot Assets"). The Debtors own the Unencumbered Assets outright, and no liens or other encumbrances burden the Unencumbered Assets.

   ii. *The Situs Assets*

1.  Coastal Breeze

21.     On August 31, 2007, Amidee 2006 Commercial purchased an apartment complex located at 2311 71st Street, Galveston, Texas 77551 ("Coastal Breeze").  In order to finance the purchase of Coastal Breeze, Amidee 2006 Commercial signed a Promissory Note (the "Sterling Coastal Breeze Note") in the amount of $1,274,250 payable to Sterling.  The Sterling Coastal Breeze Note is secured by a Deed of Trust and Security Agreement (Assignment of Rents Leases and Financing Statement) (together with the Sterling Coastal Breeze Note, the "Sterling Coastal Breeze Loan Documents").  Amidee 2006 Commercial does not know the exact amount currently due to Sterling under the Sterling Coastal Breeze Note, but believes that the principal balance of the Sterling Coastal Breeze Note as of the Petition Date was approximately $1,100,000.  Pursuant to the Sterling Coastal Breeze Loan Documents, it appears that Sterling has a lien on most, if not all, of Amidee 2006 Commercial's Coastal Breeze assets including the cash generated by Coastal Breeze through the collection of rent.

2.  Park Place

24.     On February 14, 2008, Amidee 2007 purchased an apartment complex located at 8401 Park Place, Houston Texas 77017 ("Park Place").  In order to finance the purchase of Park Place, Amidee 2007 signed a Promissory Note (the "Sterling Park Place Note") in the amount of $760,000 payable to Sterling.  The Sterling Park Place Note is secured by a Deed of Trust and Security Agreement, Security Agreement and Assignment of Rents and Leases all executed on February 14, 2008 (together with the Sterling Park Place Note, the "Sterling Park Place Loan Documents").  Amidee 2007 does not know the exact amount currently due to Sterling under the Sterling Park Place Note, but believes that the principal balance of the Sterling Park Place Note as of the Petition Date was approximately $700,000.  Pursuant to the Sterling Park Place Loan

11

Documents, it appears that Sterling has a lien on most, if not all, of Amidee 2007's Park Place assets including the cash generated by Park Place through the collection of rent.

### 3. Oak Pointe

25. On March 25, 2008, Amidee Oak Pointe purchased an apartment complex located at 1111 Burke, Pasadena, Texas 77056 ("Oak Pointe"). In order to finance the purchase of Oak Pointe, Amidee Oak Pointe signed a Promissory Note (the "Sterling Oak Pointe Note") in the amount of $2,920,000 payable to Sterling. The Sterling Oak Pointe Note is secured by a Deed of Trust and Security Agreement (with Assignment of Rents and Leases and Financing Statement) executed March 25, 2008 (together with the Sterling Oak Pointe Note, the "Sterling Oak Pointe Loan Documents"). Amidee Oak Pointe does not know the exact amount currently due to Sterling under the Sterling Oak Pointe Note, but believes that the principal balance of the Sterling Oak Pointe Note as of the Petition Date was approximately $2,700,000. Pursuant to the Sterling Oak Pointe Loan Documents, it appears that Sterling has a lien on most, if not all, of Amidee Oak Pointe's assets including the cash generated by Oak Pointe through the collection of rent.

### 4. Harbour Glen

26. On October 31, 2008, Amidee 2008 purchased an apartment complex located at 1225 10th St. N., Texas City, Texas 77590 ("Harbour Glen"). In order to finance the purchase of Harbour Glen, Amidee 2008 signed a Loan Agreement & Promissory Note (the "Harbour Glen Note") in the amount of $1,920,000 payable to Lone Star Bank ("Lone Star," and collectively with Sterling, the "Secured Lenders"). The Harbour Glen Note is secured by a Deed of Trust and Security Agreement (with Assignment of Rents and Leases) executed on October 31, 2008 (together with the Harbour Glen Note, the "Harbour Glen Loan Documents"). Amidee 2008

12

does not know the exact amount currently due to Lone Star under the Harbour Glen Note, but believes that the principal balance of the Harbour Glen Note as of the Petition Date was approximately $1,850,000. Pursuant to the Harbour Glen Loan Documents, it appears that Lone Star has a lien on most, if not all, of Amidee 2008's Harbour Glen assets including the cash generated by Harbour Glen through the collection of rent.

5. Findlay Apartments

25. In February 2005, Amidee 2006 Preferred purchased an apartment complex located at 8117 Findlay, Houston, Texas 77017 ("Findlay," and collectively with Coastal Breeze, Park Place, Oak Pointe, Harbour Glen, and the 35 acre tract on Ley Road the "Situs Assets," and the Situs Assets together with the Camelot Assets, the "Assets"). A list of all of the Assets is attached to the proposed Bid Procedures which are attached hereto as Exhibit A. The Debtors own Findlay outright, and no liens or other encumbrances burden the property.

### III. RELIEF REQUESTED

26. By the Motion, the Debtors request the entry of an order (the "Sale Procedure Order," the proposed form of which is filed herewith ) which will, among other things: (i) establish auction and bidding procedures that will govern the sale of the Assets, including approving a form of Asset Purchase Agreement which bidders will use when submitting a bid (the "APA,"), a form APA will be submitted by the Debtors prior to the Sale Hearing (defined below), (ii) schedule the hearing (the "Sale Hearing") to approve the sale of the Assets (the "Sale") to the bidder(s) that submit the bids that are deemed the highest and best bids (in each instance, a "Successful Bidder"); (iii) approve the proposed form of service of notice of the Sale; and (iv) approve the form of service related to the assumption and assignment of unexpired leases and executory contracts.

**A.     Bid Procedures**

27.     To ensure that the Sale maximizes the value of the Assets, the Debtors propose certain bidding and auction procedures (the "Bid Procedures," attached hereto as **Exhibit A**). The Assets may be sold in bulk or in piecemeal as necessary to maximize the value to be paid by Successful Bidder(s) (as defined below) for the Assets.  Accordingly, potential purchasers of the Assets may submit bids to purchase any or all of the Assets.

28.     The pertinent portions of the Bid Procedures are listed below.  In the event that the below summary conflicts with the Bid Procedures attached hereto, the attached Bid Procedures shall control.

- Minimum Opening Bids and Overbids.  Prior to the Sale Procedure Hearing, the Debtors will file a notice with the Bankruptcy Court (the "Minimum Bid Notice"): (i) identifying the minimum amount that a bid for a specific Asset must be in order to open the bidding at the Auction (the "Minimum Opening Bid"); (ii) identifying the minimum amount by which a new bid at the Auction must exceed the previous highest bid for a specific Asset (the "Minimum Overbid"); (iii) identifying the amount (the "Qualified Bid Deposit") that must be deposited by an interested bidder prior to the Auction in order to become a Qualified Bidder (defined below); and (iv) attaching the proposed forms of APA to be used to consummate the sale of each of the Assets.  Upon approval of these Bid Procedures by the Bankruptcy Court, the Debtors shall incorporate the information included in the Minimum Bid Notice along with any changes announced at the Sale Procedure Hearing and/or required by the Bankruptcy Court prior to approval of these Bid Procedures into the Property Schedule attached to the Bid Procedures as Exhibit 1.

- Qualified Bidder Requirements.  The Debtors shall determine in their sole discretion whether a potential bidder is a Qualified Bidder.  All parties desiring to become a Qualified Bidder must deliver, no later than the Bid Deadline, the Bidder Qualification Statement (defined below), a Qualified Bid Deposit, and any other required items, to Debtor's counsel, Okin Adams & Kilmer LLP (att'n Sara Mya Keith), 1113 Vine St., Suite 201, Houston, Texas 77002.  In order to be a "Qualified Bidder," a potential bidder must be a person or entity that:

    - has delivered to the Debtors an executed confidentiality agreement in form and substance acceptable to the Debtors;

- has delivered to the Debtors a signed statement (a "Bidder Qualification Statement") setting forth the following information:

    o the full name and address of the proposed bidder, and if the proposed bidder is an entity, a description of such entity's ownership and structure sufficient to allow the Debtors to determine the identity of the individuals who control such entity;

    o satisfactory evidence, in the opinion of the Debtors, of committed financing or other confirmable fiscal wherewithal to consummate a purchase should such potential bidder be determined to be the highest bidder for an Asset at the Auction;

    o confirmation that the form APA is acceptable to the potential bidder or if the potential bidder requires modifications to the APA attaching a copy of the APA showing the bidder's proposed changes which shall not include the addition of any financing contingency;

    o an affirmative statement from the bidder that it will fully and completely comply with these Bidding Procedures;

- has delivered a good-faith deposit in an amount equal to the Qualified Bid Deposit[7] identified in the Property Schedule for the Assets upon which the bidder proposes to bid, in the form of a bank draft or wire transfer paid to the Debtors' counsel, Okin Adams & Kilmer LLP (wire instructions can be obtained from the Debtors);

- has delivered the above items so that they are received by the Debtors on or before 5:00 pm Central Time on September 17, 2010 (the "Bid Deadline"); and

- meets all other requirements of these Bid Procedures.

- Due Diligence Period.  Contingent upon the submission of a confidentiality agreement approved by the Debtors, and to assist potential bidders in conducting due diligence as to the Assets, the Debtors shall, until September 22, 2010 (the "Due Diligence Period"), provide potential bidders access to the Debtors' books, records, facilities, and professionals.  If a Qualified Bidder elects to withdraw as a bidder and have its Qualified Bid Deposit returned prior to the Auction, it must submit written notice (the "Withdrawal Notice") of such withdrawal prior to the conclusion of the Due Diligence Period.

- Auction.  An auction for the sale of the Assets (the "Auction") will be held at 9:00 a.m. Central Time on September 23, 2010 at a location to be determined in

---

[7] Only one Qualified Bid Deposit will be required per Qualified Bidder.  While a Qualified Bidder may bid on multiple Assets, it will, however, only be eligible to bid on Assets for which the required Qualified Bid Deposit is equal to or less than the amount deposited by such Qualified Bidder.

15

Houston, Texas. The Debtors reserve all rights to cancel or reschedule the Auction for any reason at any time. In order to participate in the Auction, all Qualified Bidders must appear in person at the Auction, or through a duly authorized representative. In addition to Qualified Bidders (along with their advisors and counsel), only representatives and advisors of the Debtors (including Situs and Camelot), the Secured Lenders, and Office of the United States Trustee for Region 6 shall be entitled to be present at the Auction. The Debtors may arrange for a stenographic record of the Auction to be made. Each Qualified Bidder shall be required to confirm that it has not engaged in any actions that would be considered inconsistent with these Bid Procedures or fundamentals of fairness with respect to the bidding on the Assets.

The Auction shall be conducted in rounds and in any order the Debtors determine. The Debtors will separately evaluate bids received during the Auction, including bids for individual Assets as well as bids for groups of Assets or the Assets in their entirety. The Debtors reserve the right to aggregate bids for individual Assets and compare such aggregated bids with bids for all or groups of the Assets in determining the then current best bid. The Debtors may return to an Auction for any group of the Assets at any time, until the Debtors have determined and named a Successful Bidder(s) for all of the Assets. At the end of every round, the Debtors shall declare the highest or otherwise best bid or bids at that time for the Assets then under consideration. The Debtors reserve the right to approach any bidder and seek clarification to any bid at any time including, without limitation, inviting any bidder to communicate with other bidders if such communication would be beneficial to the Auction.

Each Qualified Bidder shall have the right to continue to improve its respective bid at the Auction. The initial minimum bid accepted at the Auction for each Asset shall be the amount of the Minimum Opening Bid established in the Property Schedule attached to the Bid Procedures as Exhibit 1. Thereafter, Qualified Bidders may bid in any increments that they deem fit; provided however, that each subsequent bid must at least include a minimum increase from the previous highest bid equivalent to the Minimum Overbid for the specific Asset or the cumulative Minimum Overbid for the group of Assets.[8] Upon a determination by the Debtors that no further higher or otherwise better bid or bids have been received, the Debtors may conclude the Auction.

At the conclusion of the Auction, the Debtors shall determine which Qualified Bidder has submitted the highest and best bid (a "<u>Successful Bid</u>") and the Qualified Bidder submitting the next highest and best bid (a "<u>Reserve Bid</u>"). The Qualified Bidder(s) submitting the Successful Bid(s) shall become a "<u>Successful Bidder(s)</u>," and the Qualified Bidder(s) submitting the Reserve Bid(s) shall

---

[8] Notwithstanding the contemplated Minimum Overbids set forth on Exhibit 1 to the Bid Procedures, the Debtors fully reserve any and all rights to modify the bid increment requirement, considering, among other factors, dollar value of the bid(s) and the Assets which are included in the bid(s).

- become a "Reserve Bidder(s)." Successful Bidder(s) and Reserve Bidder(s) may be named for some or all of the Assets, as determined by the Debtors.

- Credit Bid. Both Sterling and Loan Star shall be entitled to exercise any credit bid rights they may have pursuant to § 365(k) of the Bankruptcy Code as to any Assets which are the subject of any verified indebtedness owed by any of the Debtors to either Sterling or Loan Star. For purposes of these Bid Procedures, both Sterling and Loan Star shall each be deemed to be Qualified Bidders and shall be entitled to participate in the Auction without having to satisfy any of the other requirements to be a Qualified Bidder.

- Payment of Brokerage Commissions. Situs shall only receive the Situs Commission in the event that a sale of the Situs Assets is made to a Qualified Bidder procured directly by Situs. Camelot shall receive the Camelot Commission with respect to any Camelot Assets which are sold at the Auction. The Debtors shall not pay brokerage commissions incurred by any bidder in the Auction.

- Closing. The closing of any sale of any of the Assets (or a portion thereof) will occur in accordance with the terms of the Successful Bidder's APA, and shall occur not later than 20 days after entry of the Sale Order (the "Closing"). The Debtors shall file and serve a schedule (the "Schedule") of the unexpired leases and executory contracts to be assumed by the Successful Bidder(s) on all parties to such agreements as soon as is practicable, and in no event later than 20 days following the Closing, which Schedule shall include the Debtors' calculation of the amount they believe must be paid to cure all defaults under each of the unexpired leases and executory contracts that are to be assumed and assigned to the Successful Bidder (collectively, the "Cure Amounts").

28.     Bid Procedures should be approved if they provide a benefit to the estate by maximizing the value of the assets. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535-537 (3d Cir. 1999). Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy. *In re Integrated Res., Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992).

29.     The Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. Such bidders will increase the likelihood that the

Debtors receive the best possible consideration for the Assets by helping to ensure a competitive and fair bidding process. The Bid Procedures will also allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which is essential to maintaining and potentially maximizing value for the estates. Accordingly, the Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment.

**B.     Sale Hearing**

30.     The Debtors also seek the scheduling of the Sale Hearing to consider the Sale Motion, which seeks the entry of an order: (i) authorizing the sale of substantially all of the Assets, free and clear of liens, claims, interests and encumbrances, subject to higher or better offers; and (ii) approving the assumption and assignment of certain executory contracts and unexpired leases in connection with such sale and determining and adjudicating Cure Amounts with respect to such contracts and leases. The Debtors request that the Sale Hearing be held approximately seven (7) days after the completion of the Auction currently scheduled to take place on September 23, 2010.

31.     The Debtors request that the Bankruptcy Court determine that objections, if any, to the Sale Motion and the Sale Order shall be in writing, shall conform to the Bankruptcy Rules, Local Rules, and orders of this Bankruptcy Court, and shall set forth: (i) the nature of the objector's claims against or interests in the Debtors' estates; (ii) the basis for the objection; (iii) the specific grounds therefore; and (iv) all evidence in support of said objection. Objections shall be filed and served so as to be received no less than five (5) days prior to the Sale Hearing by: (i) the Debtors; (ii) the United States Trustee; (iii) counsel for Sterling and Loan Star; and (iv) all parties requesting service of notice and other motions and pleadings in these chapter 11 proceedings.

**C.     Form and Manner of Service of Notice of Sale and of Assumption and Assignment of Unexpired Leases and Executory Contracts**

*i.     Form and Manner of Service of Notice of Sale*

33.     The Debtors propose to give notice of the Sale, the Sale Procedure Order, the Auction, and the Sale Hearing in the form and manner set forth in the proposed sale notice attached hereto as **Exhibit B** (the "Sale Notice").  As set forth in the Sale Notice, persons desiring to object to the Sale Motion must file with the Bankruptcy Court and serve upon: (i) the Debtors; (ii) the United States Trustee; (iii) counsel for Sterling and Loan Star; and (iv) all parties requesting service of notice and other motions and pleadings in these chapter 11 proceedings, an objection no later than five (5) days prior to the Sale Hearing.  If timely objections are received, the Bankruptcy Court will hear the objections at the Sale Hearing.

*ii.     Form and Manner of Service of Notice of Assumption and Assignment of Unexpired Leases and Executory Contracts*

33.     The Debtors propose to file and serve upon all parties to the contracts that are or may be assumed or assigned in connection with the Sale a notice of assumption and assignment of such contracts (the "Cure Claim Notice," attached hereto as **Exhibit C**) on or before September 23, 2010.  The Debtors reserve the right to modify the Cure Claim Notice as necessary and applicable.  The Schedule attached to the Cure Claim Notice shall include the Debtors' calculation of the Cure Amounts.  The Debtors reserve the right to amend and modify the Cure Amounts as necessary and applicable.  Unless the non-Debtor party to such contract files with the Bankruptcy Court and serves upon: (i) the Debtors; (ii) the United States Trustee; (iii) counsel for Sterling and Loan Star; and (iv) all parties requesting service of notice and other motions and pleadings in these chapter 11 proceedings, an objection to its scheduled Cure Amount no less than five (5) days prior to the Sale Hearing, such party shall be forever barred

from objecting to the Cure Amount, and from asserting any additional cure or other amounts with respect to such contract.  If an objection to a scheduled Cure Amount is filed in accordance with this paragraph, the Court will hear that objection at the Sale Hearing.

34. The Debtors submit that the Sale Notice and Cure Claim Notice are reasonably calculated to provide timely and adequate notice to the Debtors' creditors, parties-in-interest, and parties interested in bidding on the Assets.  Accordingly, the Debtors submit that such notices constitute good and sufficient notice under the circumstances with respect to the Sale Motion, all proceedings to be held thereon, and the entry of the orders granting all of the relief requested herein.

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court: (i) enter the Sale Procedure Order, substantially in the form filed herewith; and (ii) grant any other and further relief as the Bankruptcy Court deems appropriate.

**OKIN ADAMS & KILMER LLP**

By: _____/s/ *Sara Mya Keith*_____
Matthew S. Okin (TB# 00784695)
mokin@oakllp.com
Sara Mya Keith (TB# 24062938)
skeith@oakllp.com
1113 Vine St. Suite 201
Houston, TX  77002
Tel:  (713) 228-4100
Fax:  (888) 865-2118

**ATTORNEYS FOR THE DEBTORS**