**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 10-20041 |
| | § | |
| AMIDEE CAPITAL GROUP, INC., ET AL., | § | CHAPTER 11 |
| | § | |
| DEBTORS. | § | (Jointly Administered) |

**MOTION FOR ORDER (I) AUTHORIZING
THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, FREE
AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, SUBJECT
TO HIGHER OR BETTER OFFERS; (II) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION WITH SUCH SALE AND DETERMINING AND
ADJUDICATING CURE AMOUNTS WITH RESPECT TO SUCH CONTRACTS AND
LEASES; (III) WAIVING THE FOURTEEN-DAY STAY PERIOD PROVIDED BY
BANKRUPTCY RULE 6004(H) AND 6006(D); AND (IV) GRANTING RELATED RELIEF**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF
> YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE
> MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING
> PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY
> TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE
> WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR
> RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.
> IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE
> GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE
> MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND
> THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT
> MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE
> MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

COMES NOW, Amidee Capital Group, Inc. ("ACG" or the "Debtor") on behalf of itself

and its affiliates, all debtors and debtors in possession in the above referenced bankruptcy

proceedings, and files this Motion for an Order: (i) Authorizing the Sale of Substantially All of the

Debtors' Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, Subject to Higher

or Better Offers; (ii) Approving the Assumption and Assignment of Certain Executory Contracts

and Unexpired Leases in Connection With Such Sale and Determining and Adjudicating Cure

Amounts With Respect to Such Contracts and Leases; (iii) Waiving the Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h) and 6006(d); and (iv) Granting Related Relief (the "Sale Motion"), pursuant to which the Debtors (defined below), request the entry of an order: (i) authorizing the sale of substantially all of the Debtors' assets, free and clear of liens, claims, encumbrances, subject to higher or better offers; (ii) approving the assumption and assignment of certain executory contracts and unexpired leases in connection with such sale and determining and adjudicating cure amounts with respect to such contracts and leases; (iii) waiving the fourteen-day stay period provided by Bankruptcy Rule 6004(h) and 6006(d); and (iv) granting related relief.  In support of the Sale Motion, the Debtors respectfully represent as follows:

## I. <u>JURISDICTION</u>

1.     This Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate underlying the requested relief is §§ 105, 363, and 365 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II. <u>BACKGROUND</u>

**A.     General Background of the Debtors**

2.     On January 4, 2010 (the "Corpus Petition Date"), Amidee 2006 Preferred-Corpus, Ltd. ("Amidee Corpus"), a subsidiary of ACG, filed a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Bankruptcy Court").  On January 17, 2010 (the "Petition Date"), ACG and nine of its other subsidiaries also filed voluntary petitions for relief under chapter 11 with the

2

Bankruptcy Court.[1]   The Debtors' bankruptcy cases are collectively referred to as the "Reorganization Cases."

3.      Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtors remain in possession of their property and are managing their businesses as debtors in possession.  No trustee or examiner has been appointed in the Reorganization Cases.

4.      ACG is a Texas corporation formed in 2003 to acquire, renovate, operate and resell real property in Texas and throughout the United States.  Initially, ACG focused its operations on the purchase of tax lien certificates on real property in Houston and the surrounding area.  The "tax deed" properties acquired by ACG were purchased using funds raised pursuant to private placements of capital raised by ACG through the sale of limited partnership interests in the Subsidiary Debtors—Amidee 2004 Tax, Amidee 2005 Tax and Amidee 2006 Tax.  Much of the real property ultimately acquired by ACG using the capital raised for these tax deed programs was either raw land or single family homes.

5.      In 2006, ACG expanded its investment activities beyond raw land and single family homes and began actively looking to acquire and operate apartment complexes and office buildings.  To fund these new acquisitions, in 2006, ACG raised additional capital through the sale of limited partnership interests in two additional limited partnerships—Amidee 2006 Preferred and Amidee 2006 Commercial.   In 2007, 2008 and 2009, ACG formed an additional limited

---

[1] The ACG subsidiaries who filed bankruptcy petitions on January 17, 2010, were: Amidee 2004-I Tax Deed and Certificate Investment Program, Ltd. ("Amidee 2004 Tax"); Amidee 2005-II Tax Deed Investment Program, Ltd. ("Amidee 2005 Tax"); Amidee 2006-III Tax Deed and Real Estate Investment Program, Ltd. ("Amidee 2006 Tax"); Amidee 2006 Preferred Real Estate Income Program, Ltd. ("Amidee 2006 Preferred"); Amidee 2006 Commercial Real Estate Income Program, Ltd. ("Amidee 2006 Commercial"); Amidee 2007-I CRE Income Fund, Ltd. ("Amidee 2007"); Amidee 2008-I CRE Income Fund, Ltd. ("Amidee 2008"); Amidee 2009-I CRE Income Fund, Ltd. ("Amidee 2009"); and Amidee Oak Pointe Apartments, LLC ("Amidee Oak Pointe") (collectively with Amidee Corpus, the "Subsidiary Debtors" and with ACG, the "Debtors").Tax"); Amidee 2006-III Tax Deed and Real Estate Investment Program, Ltd. ("Amidee 2006 Tax"); Amidee 2006 Preferred Real Estate Income Program, Ltd. ("Amidee 2006 Preferred"); Amidee 2006 Commercial Real Estate Income Program, Ltd. ("Amidee 2006 Commercial"); Amidee 2007-I CRE Income Fund, Ltd. ("Amidee 2007"); Amidee 2008-I CRE Income Fund, Ltd. ("Amidee 2008"); Amidee 2009-I CRE Income Fund, Ltd. ("Amidee 2009"); and Amidee Oak Pointe Apartments, LLC ("Amidee Oak Pointe") (collectively with Amidee Corpus, the "Subsidiary Debtors" and with ACG, the "Debtors").

partnership each year and raised capital through the sale of the limited partnership interests in those entities—Amidee 2007, Amidee 2008 and Amidee 2009.

6.      In the six years from 2004 to 2009, ACG raised approximately $24 million through the sale of limited partnership interests.  Combined, approximately 350 different entities or individuals own limited partnership interests in one or more of the Subsidiary Debtors.  While the number and identity of the limited partners vary for each of the Subsidiary Debtors, ACG is the sole general partner for each Subsidiary Debtor.[2]

7.      In addition to the Subsidiary Debtors, ACG owns significant stakes in certain non-debtor entities.  Specifically, ACG owns 100% of the outstanding shares of Amidee Hotels & Resorts, Inc., a Texas corporation, that owns and operates the Amidee Hotel Niagara in Niagara Falls, New York and the Parkway Plaza Hotel and Convention Center in Casper, Wyoming.[3] While these non-debtor entities are ultimately controlled by ACG and share some of the liquidity issues that triggered the bankruptcy filing of the Debtors, ACG determined that chapter 11 filings for these entities, at this time, would not be beneficial for those entities, their creditors or the properties that they own.  ACG, however, intends to continue to manage these entities and their properties during the course of these Reorganization Cases.

8.      In addition to the funds raised from the sale of limited partnership interests, ACG has in the past obtained funds for the acquisition, renovation and operation of the various properties it and its subsidiaries own through secured loans from various lending institutions and individuals.  As of the Petition Date, ACG or one of the Subsidiary Debtors was the primary

---

[2] Amidee Oak Pointe is actually an LLC, and ACG is therefore its sole managing member, rather than general partner. Amidee Oak Pointe and Amidee Corpus are special purpose entities formed to own a single piece of real property, and therefore third party investors do not own limited partnership interests (or non-managing membership interests) in these entities.  Instead, all of Amidee Corpus' limited partnership interests are owned by Amidee 2008 and all of the non-managing membership interests in Amidee Oak Pointe are owned by Amidee 2007.

[3] Amidee Hotel Niagara is owned by Amidee Hotel Niagara, LLC and Parkway Plaza is owned by Amidee Wyoming, LLC both of which are 100% owned by Amidee Hotels & Resorts, Inc.

borrower on approximately $10.5 million in loans secured by various real property owned by the Debtors.  In addition to these direct obligations of some of the Debtors, some of ACG's non-debtor subsidiaries are also borrowers on approximately an additional $11.5 million in secured debt.[4]  ACG estimates that the portfolio consisting of the real property owned directly by one of the Debtors is worth approximately $26.5 million

9.       All of the apartment complexes and office buildings owned by the Debtors are managed and operated directly by ACG personnel.  ACG personnel are responsible for all aspects of the acquisition of properties as well as the marketing and eventual sale of those properties.  Because ACG manages all aspects of the Subsidiary Debtors' operations, none of the Subsidiary Debtors has its own employees.   Up until September 2009, ACG maintained a staff of approximately 30 employees and contract personnel to run the operations of ACG and all of its subsidiaries, including the Subsidiary Debtors.  In an effort to reduce its overhead, in September 2009, ACG significantly reduced its staff by eliminating all personnel except those essential to keeping the properties operating.  As of the Petition Date, ACG had 9 full time employees, and 6 contract workers.[5]

10.      During the five years from 2004 to 2009, ACG successfully managed the real estate portfolio that it and its subsidiaries had acquired.  In addition to servicing the secured debt incurred in the acquisition and renovation of numerous properties, ACG made in excess of $7 million in interest payments and distributions to the numerous investors in the various real estate entities it manages.   By mid-2009, however, a number of factors, including the overall downturn in the United States' economy and the real estate market in particular, contributed to making ACG's cash

---

[4] ACG is a guarantor of approximately $9.6 million of this amount which was borrowed by Amidee Hotels & Resorts.

[5] James T. Cook and Judith B. Cook, ACG's CEO and President, respectively, are not included in these employment numbers as they have voluntarily gone without salary since September 2009.

flow extremely tight.  ACG and its subsidiaries began having difficulty paying ongoing operating expenses and servicing their secured debt while still making fixed distributions to limited partners in the Subsidiary Debtors.  In September 2009, ACG informed the limited partners in the Subsidiary Debtors that it was suspending regular partner distributions until it could get its cash flow difficulties under control.

11.     Unfortunately, the 4th quarter of 2009 did not bring improvement in the Debtors' cash flow situation.  Although ACG actively marketed most of the Debtors' real estate portfolio, it was unable to locate buyers for the properties at acceptable prices.  In December 2009, ACG retained Douglas J. Brickley of LECG, LLC to advise it with regard to possible restructuring options for ACG and its subsidiaries and help the Debtors to manage their worsening liquidity crisis.

12.     On January 4, 2010, ACG determined that filing a bankruptcy petition for Amidee Corpus was necessary in order to prevent foreclosure the next day on an office building in Corpus Christi, Texas owned by Amidee Corpus.  Although the bankruptcy of Amidee Corpus helped to avoid the immediate emergency that triggered the initial bankruptcy filing, ACG determined that no long-term solution to its liquidity crisis was likely without an opportunity to restructure the Debtors through a chapter 11 bankruptcy process.  Thus, on January 16, 2010, ACG's board of directors authorized chapter 11 filings for the Debtors and appointed Douglas Brickley as the Chief Restructuring Officer for ACG and the Subsidiary Debtors.  Pursuant to the board's resolution, Mr. Brickley has been given exclusive control of the Debtors' operations in bankruptcy and the restructuring effort.  ACG believes that the bankruptcy filings and the experienced leadership of Mr. Brickley will provide the Debtors with the best chance of reorganizing their operations and paying the greatest possible return to the Debtors' creditors and equity security holders.

**B.      Decision to Sell the Assets**

13.      After extensive evaluation of their business, consideration of all possible alternatives, and consultation with their various professionals, the Debtors have determined that an auction of substantially all of their Assets (defined below) is in the best interest of their estates and creditors, as such an auction will provide a fair and open process for sale which will afford the Assets the exposure to market forces necessary to maximize the value of the Assets.

14.      On July 30, 2010, the Debtors filed their *Motion for an Order: (i) Approving Auction and Bidding Procedures and Auction Date; (ii) Scheduling Date and Time for Sale Hearing; (iii) Approving Form and Manner of Service of Notice of the Sale Hearing and Auction; (iv) Approving the Form and Manner of Service of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (v) Granting Related Relief* (the "Sale Procedure Motion") [Doc. No. 276], pursuant to which the Debtors, in connection with the relief requested in the Sale Motion, request the entry of an order: (i) approving auction (the "Auction") and bidding procedures (the "Bid Procedures") and an auction date; (ii) scheduling a date and time for sale hearing (the "Sale Hearing"); (iii) approving the form and manner of service of notice of the sale hearing and auction (the "Sale Notice"); (iv) approving the form and manner of service of notice of the assumption and assignment of certain executory contracts and expired leases (the "Cure Claim Notice"); and (v) granting related relief.  The Debtors believe that the Sale Procedure Motion and the procedures contemplated within are in the best interests of the Debtors' estates and all other interested parties in these bankruptcy cases, as an orderly sale of the Assets is essential and very likely to result in greater value to the Debtors' estates than any piecemeal liquidation.

C.      **The Brokers**

15.      In connection with the marketing and sale of the Assets, the Debtors have retained two brokers, Situs, Inc. ("Situs") and Camelot Realty Group ("Camelot," and collectively with Situs, the "Brokers").

i.   *Situs*

16.      On April 26, 2010, the Debtors filed their *Application for an Order Pursuant to Sections 327(a) and 328 of the Bankruptcy Code Authorizing the Employment and Retention of Situs, Inc. as Real Estate Broker for the Debtors Nunc Pro Tunc to April 1, 2010* (the "Situs Retention Application"), pursuant to which the Debtors requested authority to retain Situs in connection with the marketing and sale of the Situs Assets (defined below).  The terms of Situs' retention are governed by that certain Exclusive Commercial Real Estate Listing Agreement, dated April 23, 2010 (the "Situs Retention Agreement").  The Situs Retention Agreement provides, among other things, that: (i) Situs shall be retained as broker to the Debtors from April 1, 2010 to July 1, 2010 (the "Situs Term"); and (ii) Situs shall be entitled to a commission of 5% of the gross sales price of the Situs Assets in the event of a successful sale of the Situs Assets (the "Situs Commission"); provided, however, that if a sale of the Situs Assets occurs after the expiration of the Situs Term, but within 180 days of the end of the Situs Term, Situs will receive the Situs Commission if any of the Situs Assets (defined below) are sold to a Qualified Bidder (defined below) procured through Situs' marketing efforts.  On May 13, 2010, the Bankruptcy Court entered an order approving the Situs Retention Application pursuant to the terms of the Situs Retention Agreement.

    *ii.*  *Camelot*

  17.  On June 14, 2010, the Debtors filed their *Application for an Order Pursuant to Sections 327(a) and 328 of the Bankruptcy Code Authorizing the Employment and Retention of Camelot Realty Group as Real Estate Broker for the Debtors Nunc Pro Tunc to June 1, 2010* (the "Camelot Retention Application"), pursuant to which the Debtors requested authority to retain Camelot as real estate broker in connection with the marketing and sale of the Camelot Assets (defined below).  The terms of Camelot's retention are governed by that certain Residential Real Estate Listing Agreement, dated June 14, 2010 (the "Camelot Retention Agreement").  The Camelot Retention Agreement provides, among other things, that: (i) Camelot shall be retained as broker to the Debtors from April 1, 2010 to March 31, 2011 (the "Camelot Term"); and (ii) Camelot shall be entitled to a commission of 3% of the gross sales price of the Camelot Assets (the "Camelot Commission") in the event of a successful sale of the Camelot Assets (defined below) during the Camelot Term.  On July 8, 2010, the Bankruptcy Court entered an order approving the Camelot Retention Application pursuant to the terms of the Camelot Retention Agreement.

**D.**  **The Sale Assets[6]**

    *i.*  *The Camelot Assets*

      1.  Commercial Acreage

  18.  On August 22, 2007, ACG obtained a Revolving Credit Note (the "Sterling Note") payable to Sterling Bank ("Sterling") with a credit limit of up to $1,635,000.  The Sterling Note is secured by a Deed of Trust and Security Agreement (with Assignment of Rents and Leases and Financing Statement) ("Sterling Deed of Trust") (together with the Sterling Note, the "Sterling Loan Documents") dated same that grants James W. Goolsby (the "Trustee"), in trust for the

---

[6] A list of the individual properties which comprise the Assets (defined below) is attached to the proposed Bid Procedures which are attached to this Sale Procedure Motion as Exhibit A.

benefit of Sterling a security interest in certain commercial acreage owned by ACG, namely the properties in Houston, Texas known as: (i) Martin Luther King Blvd. 12100; (ii) West Orem; and (iii) Blanco & Ley Road (together, the "Commercial Acreage").  Sterling also retains a security interest in the personal property and fixtures located on the Commercial Acreage.  Pursuant to the Sterling Loan Documents, it appears that Sterling has a lien on the Commercial Acreage including the cash generated by same.  ACG does not know the exact amount currently due to Sterling under the Sterling Note, but believes that the principal balance of the Sterling Note as of the Petition Date was approximately $1,250,000.

### 2.   Rent Houses

19.     ACG also obtained a loan from Sterling to finance the purchase of certain rental houses located in Houston, Texas at Avenue G and 2425 Lucky Street (the "Rent Houses").  It appears that Sterling has a lien on the Rent Houses including any cash generated by same.  ACG does not know the exact amount currently due to Sterling under the loan documents for the Rent Houses, but believes that the principal balance due as of the Petition Date was approximately $85,000.

### 3.   Unencumbered Assets

20.     In addition to the Commercial Acreage and the Rent Houses, the Debtors own a series of both developed and undeveloped parcels of land in and around the Houston, Texas area (the "Unencumbered Assets," and collectively with the Commercial Acreage and the Rent Houses, but not including the 35 acre tract on Ley Road the "Camelot Assets").  The Debtors own the Unencumbered Assets outright, and no liens or other encumbrances burden the Unencumbered Assets.

ii.     *The Situs Assets*

1.     Coastal Breeze

21.     On August 31, 2007, Amidee 2006 Commercial purchased an apartment complex located at 2311 71st Street, Galveston, Texas 77551 ("Coastal Breeze").  In order to finance the purchase of Coastal Breeze, Amidee 2006 Commercial signed a Promissory Note (the "Sterling Coastal Breeze Note") in the amount of $1,274,250 payable to Sterling.  The Sterling Coastal Breeze Note is secured by a Deed of Trust and Security Agreement (Assignment of Rents Leases and Financing Statement) (together with the Sterling Coastal Breeze Note, the "Sterling Coastal Breeze Loan Documents").  Amidee 2006 Commercial does not know the exact amount currently due to Sterling under the Sterling Coastal Breeze Note, but believes that the principal balance of the Sterling Coastal Breeze Note as of the Petition Date was approximately $1,100,000.  Pursuant to the Sterling Coastal Breeze Loan Documents, it appears that Sterling has a lien on most, if not all, of Amidee 2006 Commercial's Coastal Breeze assets including the cash generated by Coastal Breeze through the collection of rent.

2.     Park Place

22.     On February 14, 2008, Amidee 2007 purchased an apartment complex located at 8401 Park Place, Houston Texas 77017 ("Park Place").  In order to finance the purchase of Park Place, Amidee 2007 signed a Promissory Note (the "Sterling Park Place Note") in the amount of $760,000 payable to Sterling.  The Sterling Park Place Note is secured by a Deed of Trust and Security Agreement, Security Agreement and Assignment of Rents and Leases all executed on February 14, 2008 (together with the Sterling Park Place Note, the "Sterling Park Place Loan Documents").  Amidee 2007 does not know the exact amount currently due to Sterling under the Sterling Park Place Note, but believes that the principal balance of the Sterling Park Place Note as

of the Petition Date was approximately $700,000.  Pursuant to the Sterling Park Place Loan Documents, it appears that Sterling has a lien on most, if not all, of Amidee 2007's Park Place assets including the cash generated by Park Place through the collection of rent.

### 3.  Oak Pointe

23.  On March 25, 2008, Amidee Oak Pointe purchased an apartment complex located at 1111 Burke, Pasadena, Texas 77056 ("Oak Pointe").  In order to finance the purchase of Oak Pointe, Amidee Oak Pointe signed a Promissory Note (the "Sterling Oak Pointe Note") in the amount of $2,920,000 payable to Sterling.  The Sterling Oak Pointe Note is secured by a Deed of Trust and Security Agreement (with Assignment of Rents and Leases and Financing Statement) executed March 25, 2008 (together with the Sterling Oak Pointe Note, the "Sterling Oak Pointe Loan Documents").  Amidee Oak Pointe does not know the exact amount currently due to Sterling under the Sterling Oak Pointe Note, but believes that the principal balance of the Sterling Oak Pointe Note as of the Petition Date was approximately $2,700,000.  Pursuant to the Sterling Oak Pointe Loan Documents, it appears that Sterling has a lien on most, if not all, of Amidee Oak Pointe's assets including the cash generated by Oak Pointe through the collection of rent.

### 4.  Harbour Glen

24.  On October 31, 2008, Amidee 2008 purchased an apartment complex located at 1225 10th St. N., Texas City, Texas 77590 ("Harbour Glen").  In order to finance the purchase of Harbour Glen, Amidee 2008 signed a Loan Agreement & Promissory Note (the "Harbour Glen Note") in the amount of $1,920,000 payable to Lone Star Bank ("Lone Star," and collectively with Sterling, the "Secured Lenders").  The Harbour Glen Note is secured by a Deed of Trust and Security Agreement (with Assignment of Rents and Leases) executed on October 31, 2008 (together with the Harbour Glen Note, the "Harbour Glen Loan Documents").  Amidee 2008 does

not know the exact amount currently due to Lone Star under the Harbour Glen Note, but believes that the principal balance of the Harbour Glen Note as of the Petition Date was approximately $1,850,000.  Pursuant to the Harbour Glen Loan Documents, it appears that Lone Star has a lien on most, if not all, of Amidee 2008's Harbour Glen assets including the cash generated by Harbour Glen through the collection of rent.

5.      Findlay Apartments

25.     In February 2005, Amidee 2006 Preferred purchased an apartment complex located at 8117 Findlay, Houston, Texas 77017 ("Findlay," and collectively with Coastal Breeze, Park Place, Oak Pointe, Harbour Glen, and the 35 acre tract on Ley Road the "Situs Assets," and the Situs Assets together with the Camelot Assets, the "Assets").  A list of all of the Assets is attached to the proposed Bid Procedures which is attached to the Sale Procedure Motion [Doc No. 276] as Exhibit A.  The Debtors own Findlay outright, and no liens or other encumbrances burden the property.

III.  <b>RELIEF REQUESTED</b>

26.     By the Sale Motion, the Debtors request the entry of an order (the "Sale Order"): (i) authorizing the sale (the "Sale") of substantially all of the Debtors' Assets free and clear of liens, claims, interests, and encumbrances (collectively, the "Encumbrances"), subject to higher or better offers, and in accordance with the Bidding Procedures proposed in the Sale Procedure Motion; (ii) approving the assumption and assignment of certain executory contracts and unexpired leases (the "Contracts") in connection with such Sale and determining and adjudicating cure amounts (the "Cure Amounts") with respect to such contracts and leases; (iii) waiving any stay period provided under Bankruptcy Rules 6004(h) and 6006(d); and (iv) granting related relief.

13

## IV.  <u>APPLICABLE LAW</u>

**A.      The Asset Sale**

> *i.        Disposition of the Assets Is Warranted Under § 363 of the Bankruptcy Code*

26.      Section 363 of the Bankruptcy Code authorizes a debtor to use or sell assets of the estate other than in the ordinary course of business, free and clear of liens, claims, and encumbrances, and provides in relevant part:

> (b)(1)   The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…

11 U.S.C. § 363(b)(1); FED. R. BANKR. P. 6004(f)(1) ("all sales not in the ordinary course of business may be by private sale or by public auction").  Section 363(b), however, does not provide the Court an express standard in evaluating whether to approve a particular sale.  The Fifth Circuit requires an "articulated business justification" to approve such a sale:

> We also agree with the Second Circuit that implicit in § 363(b) is the further requirement of justifying the proposed transaction.  That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.  Whether the proffered business justification is sufficient depends on the case.

*In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (citations omitted).  In determining whether valid business justifications exist for a particular course of action by the debtor, a strong presumption exists "'that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695, 713 (Del. 2009)); *see also In re Mirant*, 348 B.R. 725, 744

(Bankr. N.D. Tex. 2006) ("the court is expected to defer to management's views in applying the business judgment test"); *Richmond Leasing Co. v Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (a court should not second guess a debtor's business judgment unless the judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code, as "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially").

27.     To demonstrate a sound business purpose warranting a sale, courts have developed a four-part test requiring a debtor to demonstrate: (i) a sound business reason; (ii) accurate and reasonable notice; (iii) an adequate price; and (iv) good faith.  *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (sale of substantially all of the assets was justified where the debtor could show a sound business reason, accurate and reasonable notice, adequate price, and good faith).

### 1.     Sound Business Reason

28.     A sound business reason exists for the Sale, as: (i) an orderly sale of the Assets is very likely to result in greater value to the Debtors' estates than any piecemeal liquidation; and (ii) the Auction will provide a fair and open process for sale which will afford the Assets the exposure to market forces necessary to maximize the value of the Assets.  Courts have found a sound business purpose to exist for the sale of substantially all of a debtor's assets when such a sale is necessary to preserve and maximize the value of assets.  *In re Integrated Res.*, 147 B.R. at 659 ("'It is a well-established principle of bankruptcy law that the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate'" quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N. D. Ga. 1988)).

### 2.      Accurate and Reasonable Notice

29.     The Debtors propose to give notice of the Sale, the Sale Procedure Order, the Auction, and the Sale Hearing in the form and manner set forth in the proposed sale notice attached to the Sale Procedure Motion [Doc. No. 276] as Exhibit B (the "Sale Notice").  The Debtors submit that the Sale Notice constitutes "accurate and reasonable notice" as contemplated by the courts.

30.     The Debtors also propose to file and serve upon all parties to the Contracts a notice of assumption and assignment of such contracts (the "Cure Claim Notice") in the form and manner of the cure claim notice attached to the Sale Procedure Motion [Doc. No. 276] as Exhibit C.  The Cure Claim Notice shall include the Debtors' calculation of the Cure Amounts.

31.     The Debtors submit that the Sale Notice and Cure Claim Notice are reasonably calculated to provide timely and adequate notice to the Debtors' creditors, parties-in-interest, and parties interested in bidding on the Assets.  Accordingly, the Debtors submit that the Sale Notice and the Cure Claim Notice constitute good and sufficient notice under the circumstances with respect to the Sale Motion, all proceedings to be held thereon, and the entry of the orders granting all of the relief requested herein.

### 3.      Adequate Price

32.     As mentioned above, the Debtors believe that the sale processes contemplated by the Bid Procedures are designed to maximize the value of the Assets by exposing the Assets to market forces, and will result in a more substantial recovery to the estates than any piecemeal liquidation of the Debtors.  Accordingly, the Sale and Auction will produce an "adequate price" for the Assets as contemplated by the courts.

### 4.      Good Faith

33.     The Sale and accompanying procedures proposed by the Debtors will be conducted

in "good faith," as that term has been defined by courts evaluating whether a sale is governed by a sound business purpose. Accordingly, the Debtors request that the Court determine that the entire Sale process was conducted in good faith and that the Debtors and any Successful Bidder(s) (defined below) receive the protections of § 363(m), which protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding the subsequent reversal or modification of the sale on appeal. *In re Chateaugay Corp.*, No, 92 CIV. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (stating that § 363(m) fosters the policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely); *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

ii.    *Sale of Assets Free and Clear of Encumbrances*

34.    In the interest of attracting the best offers, any Assets sold to any successful bidder(s) (a "<u>Successful Bidder</u>") through the Auction shall be free and clear of any Encumbrances in accordance with § 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to proceeds of the Sale(s). Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of Encumbrances in property of an entity other than the estate if:

(a)    applicable nonbankruptcy law permits a sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)    such interest is in *bona fide* dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

17

35.     Because § 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the Sale "free and clear" of the Encumbrances.  *In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that § 363(f) is written in the disjunctive, and holding that the court may approve the sale "free and clear" provided at least one of the subsections is met); *In re Dundee Equity Corp.*, No. 89-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met" (citations omitted)).  Even if § 363(f) was inapplicable to the instant case, the Court may also authorize the sale of a debtor's assets free and clear of any liens pursuant to § 105 of the Bankruptcy Code.  *In re Trans World Airlines Inc.*, No. 01-0056(PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)" (citations omitted)); *In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11." (citations omitted)).  The Debtors believe that at least one of the subsections of § 363(f) is satisfied.  Specifically, the Debtors believe that the holders of all Encumbrances could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

**B.     Approval of Payment of Commissions, Secured Claims and Taxes**

36.     The Debtors request authority to pay the Camelot Commission and Situs Commission as explained above out of the proceeds from the Sale(s) of the Camelot Assets or Situs Assets, pursuant to the Camelot Retention Agreement and Situs Retention Agreement, at closing.  The Debtors further request authority to pay certain pre- and post-petition real property taxes that attach to each Asset out of the proceeds from the Sale of such Asset at closing.  Under

18

Texas law, the applicable taxing authorities are granted statutory liens on the property for the total amount of taxes owed. TEX. TAX CODE ANN. § 32.01 (Vernon 2001). In addition, this tax lien has priority over all liens imposed against the property. *Id.* at § 32.05. The taxes, therefore, are fully secured by liens on any Asset to which it attaches. In the exercise of its equitable powers under § 105(a) of the Bankruptcy Code, courts have frequently authorized payment of these types of taxes where such payments would benefit the estate. *See, e.g., In re Pillowtex, Inc.*, No. 00-4211-SLR, 2002 WL 32332071, at *1 (Bankr. D. Del. June 4, 2002) (authorizing the payment of prepetition real property taxes in order to avoid further accrual of interest and penalties). Finally, the Debtors request authority to pay all claimants holding a recorded lien on any Asset out of the proceeds from the Sale of such Asset at closing. The Debtors shall submit to the Court a notice specifying the estimated closing costs and payoff amounts for the Sale of each Asset prior to the Sale Hearing ("Closing Cost Notice").

**C.      Assumption and Assignment of the Contracts Underlying the Assets**

> *i.      Assumption and Assignment of the Contracts is a Valid Exercise of the Debtors' Business Judgment*

37.      Section 365 of the Bankruptcy Code authorizes debtors in possession to assume executory contracts or unexpired leases subject to the court's approval, and requires such debtors in possession to satisfy certain requirements at the time of assumption. Under § 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Section 365(b), in turn, codifies the requirements for assuming an expired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default ... ;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a part other than the debtor to such contract or   lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

38.     Courts evaluate a decision to assume an executory contract under the "business judgment" standard.  *Richmond Leasing Co.*, 762 F.2d at 1309; *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985); *In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984)). This standard is satisfied if the debtor determines in its business judgment that the assumption of the contract or lease would benefit the estate.  *Richmond Leasing*, 762 F.2d at 1309 ("'As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." (citations omitted).  The business judgment standard requires that the court approve the debtor's business decision unless that judgment is the product of bad faith, whim, or caprice.  *Lubrizol Enters.*, 756 F.2d at 1046 and 1048.

39.     In the present case, the Debtors' assumption and assignment of the Contracts to the purchasers of the Assets meets the business judgment standard and satisfies the requirements of § 365 of the Bankruptcy Code.  As discussed above, the transactions contemplated by the asset purchase agreements governing each sale of the Assets (each, an "APA") will provide significant benefits to the Debtors' estates.  The Contracts are necessary for the purchasers of the Assets to conduct the businesses of the acquired Assets and, since the purchasers would not purchase the

Assets without them, the assumption and assignment of the Contracts is essential to inducing the highest or best offers for the Assets. Because the Debtors cannot otherwise obtain the benefits of the APA's and will have no use for any Contracts underlying the Assets once the Assets are sold, the assumption of the Contracts is a sound exercise of the Debtors' business judgment.

> ii.    *The Purchasers of the Assets Will be Capable of Providing Adequate Assurance of Future Performance*

40.    A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it: (i) assumes the agreement in accordance with § 365(a) of the Bankruptcy Code; and (ii) provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding). Pursuant to the Bid Procedures, the Debtors will require potential bidders to provide evidence constituting adequate assurance of future performance to be provided to counterparties to the Contracts.

> iii.    *Assignment of the Contracts Should be Permitted Notwithstanding Anti-Assignment Provisions*

41.    To assist in the assumption, assignment, and sale of the Contracts, the Debtors also request that the Court enter an order: (i) providing that anti-assignment provisions therein under applicable law shall not restrict, limit, or prohibit the assumption, assignment, and sale of the

Contracts or other Assets; and (ii) finding such provisions to be an unenforceable anti-assignment provision pursuant to §§ 105(a) and 365(f) of the Bankruptcy Code.

42.     Section 365(f) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions:

> Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

43.     By operation of law, § 365(f)(1) invalidates provisions or applicable law that prohibit, "restrict or condition assignment of an executory contract or unexpired lease." *Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.)*, 127 F.3d 904, 910–11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."). Section 365(f)(3) goes beyond the scope of § 365(f)(1) by prohibiting the enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *In re Jamesway Corp.*, 201 B.R. 73, 77–79 (Bankr. S.D.N.Y. 1996) (stating § 365(f)(3) prohibits enforcement of any lease clause creating a right to terminate a lease because it is being assumed or assigned, as such a clause would effectively bar an assignment by the debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

44.     Other courts have recognized that provisions which have the effect of restricting assignment cannot be enforced. *In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831–32 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease

22

provisions that are so restrictive that they constitute de facto anti-assignment provisions." (citations omitted)).  Similarly, in *In re Mr. Grocer*, the court noted that:

> The case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that the lease provisions, which are not themselves *ipso facto* anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

> 77 B.R. 349, 354 (Bankr. D. N.H. 1987).

45.     Thus, the Debtors request that any anti-assignment provisions or applicable law be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Contracts and other Assets and be deemed and found to be unenforceable anti-assignment provisions under §§ 105(a) and 365(f) of the Bankruptcy Code.  Additionally, the Debtors request that the Court find that the Sale(s) constitute a sale to a successor of ownership of substantially the entire business and that it would be unreasonable for any party to a Contract to withhold their consent to assignment of such Contract.

**D.     Waiver of the Stays Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

46.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease is stayed . . . until the expiration of 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d).  The Debtors request that any order authorizing the Sale and the assumption and assignment of the Contracts be effective immediately by providing that the 14-day stays under Bankruptcy Rule 6004(h) and 6006(d) are waived.

47.     The purpose of Bankruptcy Rule 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Creditors' Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rule 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, the leading treatise on bankruptcy suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY ¶ 6004.10 (Alan N. Resnick and Henry J. Somme eds., 15th rev. ed. Rev. 2009). Further, *Collier* suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

48.     To maximize the value received for the Assets, the Debtors seek to close the Sale(s) as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rule 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## V.  <u>CONCLUSION</u>

WHEREFORE, the Debtors request the entry of the Sale Order: (i) granting the requested relief; and (ii) granting any other and further relief deemed necessary and appropriate by this Court.

**Dated**:  August 2, 2010.

OKIN ADAMS & KILMER LLP

By:  ____ /s/ *Sara Mya Keith* ____
Matthew S. Okin (TB# 00784695)
mokin@oakllp.com
Sara Mya Keith (TB# 24062938)
skeith@oakllp.com
1113 Vine St. Suite 201
Houston, TX  77002
Tel:  (713) 228-4100
Fax:  (888) 865-2118

**ATTORNEYS FOR THE DEBTORS**